762 F.2d 1005
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
IRIS J. BOND, WHO SUES AS THE ADMINISTRATRIX OF THE ESTATE
OF RAYFORD FORRESTER BOND, FOR THE BENEFIT OF HERSELF AS THE
SURVIVING DEPENDENT WIDOW OF RAYFORD FORRESTER BOND,
DECEASED, AND MINOR DEPENDENT CHILD OF RAYFORD FORRESTER
BOND, DECEASED, AND WHO SUES FOR HERSELF AS THE SURVIVING
SPOUSE OF RAYFORD FORRESTER BOND, DECEASED, AND LARRY K.
WILSON, PLAINTIFFS-APPELLANTS,
v.
SOUTHERN RAILWAY, COMPANY, A CORPORATION; BENTON MOTEL
CORPORATION, A CORPORATION; AND HOLIDAY INNS,
INC., DEFENDANTS-APPELLEES.
 NO. 84-5226
 United States Court of Appeals, Sixth Circuit.
 4/30/85
 
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE
 BEFORE: LIVELY, Chief Judge, JONES, Circuit Judge, and WEICK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiffs-Appellants in this consolidated action have sued Benton Motel Corporation (Benton), and its licensor Holiday Inns, Inc. (Holiday Inns), pursuant to diversity jurisdiction, and the Southern Railway Company (Southern), pursuant to the Federal Employers Liability Act (FELA). The alleged liability of the defendants-appellees arises from the death of Rayford Bond and the personal injuries sustained by Larry Wilson during an armed robbery of the Holiday Inn which was owned and operated by Benton, licensed by Holiday Inns, and at which Bond and Wilson were about to register under a contract with their employer, Southern. The appellants allege that the negligence of each appellee proximately caused the injuries to Bond and Wilson. The district court granted summary judgment in favor of all appellees. We reverse.
 
 
 2
 Bond and Wilson were employees of Southern. Benton had an agreement with Southern to provide transportation and lodging for Southern employees during their layover time in Cleveland, Tennessee, between railroad runs. Southern employees could elect to stay elsewhere, but their expenses would not be reimbursed. On February 14, 1982, a Benton employee met Bond, Wilson, and two other Southern employees and transported them in a company vehicle to Benton's motel. Upon entering the motel lobby at approximately 5:40 a.m., the Southern employees found themselves in the midst of an armed robbery in progress. During the robbery, one robber shot and killed Bond; Wilson sustained injuries when he threw himself to the floor to avoid being shot.
 
 I.
 
 3
 Summary judgment in favor of Benton must be sustained if, as a matter of law, Benton's complete lack of security violated no duty towards Bond and Wilson or if, as a matter of law, any breach by Benton of a duty to provide security was not a proximate cause of the death of Bond and injuries to Wilson. Viewing the evidence in the light most favorable to the appellants, does a genuine issue exist both that Benton breached its duty to provide security and that the breach proximately caused the uncontested harm. These issues are questions of Tennessee law.
 
 
 4
 The district court granted summary judgment in favor of Benton in reliance on Cornpropst v. Sloan, 528 S.W.2d 188 (Tenn. 1975). In Cornpropst the Tennessee Supreme Court addressed the duty of shopping center owners and individual shopkeepers to protect business invitees using a shopping center parking lot against the criminal acts of third parties. The court found that no duty of protection arises unless the businesses 'know or have reason to know that acts are occurring or about to occur on the premises that pose imminent probability of harm to an invitee.' Cornpropst, 528 S.W.2d at 198. In the present case, the district court found as a matter of law that Benton did not know and had no reason to know that criminal acts endangering business invitees were occurring or were about to occur.
 
 
 5
 Cornpropst, however, does not govern the present case. The Tennessee Supreme Court stated that Cornpropst did not establish a rule governing the duty of all types of businesses towards invitees. Id. Zang v. Leonard, 643 S.W.2d 657 (Tenn. Ct. App. 1982), appeal denied, involved an assault in a motel parking lot. In Zang, the Tennessee Court of Appeals required innkeepers to use due care to employ the protective measures that 'would have been employed by a reasonably prudent motel operator under the same circumstances.' Zang, 643 S.W.2d at 663. The court also discussed the elements that a jury would properly consider among 'the circumstances' when determining whether an inkeeper satisfied this standard.
 
 
 6
 [A]ll the circumstances includ[e] the nature and use of the land, the nature of the invitation, the nature of the relationship with the invitee, the opportunity of the possessor and the invitee to know and avoid existing or probable dangers, and any and all other factors which would challenge the attention of the possessor and/or invitee to the probability of danger to the invitee and produce the precautions which a reasonably prudent person would instigate under the same or similar circumstances.
 
 
 7
 Id.
 
 
 8
 In Kveragas v. Scottish Inns, Inc. 733 F.2d 409 (6th Cir. 1984), this Court applied the Zang due care standard and reversed a district court's directed verdict in favor of the defendant innkeeper. The district court had ruled that, as a matter of law, Cornpropst's imminent danger rule was not satisfied. Kveragas, 733 F.2d at 411. The plaintiffs in Kveragas were robbed and shot when three intruders burst into their locked motel room. This Court noted that the motel room door had a hollow core, was fitted poorly into the door frame, and was supplied with only a low grade lock incorporated into the door handle and a security chain. Id. In applying Zang's due care test, this Court further elaborated on possible circumstances affecting that standard.
 
 
 9
 The factfinder may also consider the cost of various protective measures weighed against the expected benefits of those measures; the ability of the guest to protect himself by employing available and relatively inexpensive protective measures such as deadbolt locks and other devices; compliance with the industry standard, if such a standard exists and is found to be reasonable; compliance with internal safety procedures if such procedures exist; the inconvenience to guests occasioned by particular protective measures; and any other factor or circumstance which the trial court determines, in light of the particular facts of each case, is relevant to the ultimate fact question regarding reasonable protective measures.
 
 
 10
 Kveragas, 733 F.2d at 414.
 
 
 11
 When the combined Zang and Kveragas test is applied to the facts of the present case, it is evident that a genuine issue of fact remains concerning whether Benton satisfied its duty of due care under all the circumstances. Although Bond and Wilson had not yet registered at the motel, they fully intended to do so, were indeed transported there in a motel vehicle and thus were invitees at the location for the particular purpose for which it was being operated. The motel is located in a generally undeveloped area and conveniently near two highways which could provide ready escape routes to robbers. To affirm would require us to determine that as a matter of Tenessee law a reasonably prudent motel operator, under the circumstances, would provide absolutely no security measures during the night hours. We decline to so hold.
 
 
 12
 This error, however, does not mandate reversal of the district court's grant of summary judgment in favor of Benton if, as a matter of law, even reasonably prudent security measures by Benton would not have prevented Bond's death and Wilson's injuries. Benton's breach of its duty toward invitees must have been a proximate cause of the resulting injuries. As this Court noted in Kveragas, '[s]ome criminals are bent on theft or violence regardless of the obstacles placed in front of them; some crimes are therefore simply not foreseeable and others are not preventable, even with the utmost care.' Kveragas, 733 F.2d at 415. Appellees contend that no security measures Benton could have taken would have prevented the armed robbers from commandeering the motel lobby. It is uncontested that the robbers presented themselves as guests intending to register. As such they would have gained access to the lobby regardless of whatever security measures Benton had taken. Implicitly, appellees compare this case to Cornpropst, where the assailant 'gave no notice by word, act, dress or deed prior to the commission of the attack that would have indicated to anyone an intention or purpose to commit an assault.' Cornpropst, 528 S.W.2d at 197.
 
 
 13
 The armed robbers' ability to gain access to the motel lobby, however, is not the material question here. It is uncontested that the robbery began several minutes before the railroad men arrived. If night clerk Jolley had access to an alarm, then he might have driven the robbers off before the railroad men arrived. If Jolley could have activated a remote alarm, then help might have been alerted and arrived before Bond was killed and Wilson was injured. If the surveillance cameras and monitors had been operative, Jolley might have wondered about the unusual manner in which the car was pulled up on the motel's front porch. This information combined with a locked front door might have prevented the robbery. Summary judgment to Benton was improper. We can not hold on the present record that as a matter of law Benton satisfied its duty of due care while neglecting security. Nor do we hold as a matter of law that Benton's decision not to provide security was not a proximate cause of Bond's death and Wilson's injuries.
 
 II.
 
 14
 The district court also granted summary judgment in favor of Holiday Inns. The potential liability of Holiday Inns is predicated upon three elements: a finding that its licensee Benton was negligent; a finding that Benton was Holiday Inns' agent; and a finding that Holiday Inns had the right to control Benton's security provisions. We have determined that a genuine question of material fact exists concerning Benton's negligence. The district court discussed the question of whether an agency relationship existed between Holiday Inns and Benton, but did not resolve this issue as a ground for summary judgment in favor of Holiday Inns. Tennessee case law has defined agency in its broadest sense to include 'every relation in which one person acts for or represents another.' Sain v. ARA Manufacturing Co., 660 S.W.2d 499, 501 (Tenn. App. 1983) (quoting Doane Agricultural Service v. Coleman, 254 F.2d 40, 43 (6th Cir. 1958)).
 
 
 15
 The appellants maintain that Benton was Holiday Inn's agent by virtue of the License Agreement, the advisory Holiday Inns Loss Prevention Manual, and Holiday Inns' periodic inspections. Under the License Agreement, Benton agreed to operate the motel in accordance with Holiday Inns' Standards Manual, which sets forth detailed Rules of Operation. As the district court acknowledges, whether the Holiday Inns License Agreement and supporting documents create an agency relationship has not been determined as a matter of law by the Tennessee courts. Nor have other courts consistently interpreted these agreements. See, e.g., Holiday Inns, Inc. v. Newton, 157 Ga. App. 436, 278 S.E.2d 85 (Ga. App. 1981); Murphy v. Holiday Inns, Inc., 219 S.E. 2d 874 (Va. 1975); Hayward v. Holiday Inns, Inc., 459 F. Supp. 634 (E.D. Va. 1978). In the present case a genuine question of material fact exists as to whether Benton acted for or represented Holiday Inns by operating its motel in accordance with the licensing documents.
 
 
 16
 The district court properly granted summary judgment to Holiday Inns, however, unless a genuine question of material fact remains regarding whether Holiday Inns either expressly or impliedly reserved the right to control Benton's security measures at the motel. See Lindsey v. Smith & Johnson, Inc., 601 S.W.2d 923, 925 (Tenn. 1980).
 
 
 17
 It is uncontested that Benton agreed to operate its motel 'in accordance with the terms and provisions of this Licensing Agreement.' Similarly, Holiday Inns agreed '[t]o maintain supervision over licensee, to assure compliance with Holiday Inn standards as established in the system from time to time.' Part of Benton's compliance under the terms of the Licensing Agreement required it to '[m]aintain its premises and accomodations in a clean, safe and orderly manner.' It appears that as part of its commitment to supervising licensees, Holiday Inns issued its Loss Prevention Manual, which details methods of insuring guest safety. This manual did not establish mandatory security procedures for licensee motels. Yet, this fact alone does not establish that Holiday Inns retained no authority to require at least minimally prudent security provisions by licensee motels in its system. Finally, Richard Zurburg, of Holiday Inn University, stated in a deposition that the Holiday Inn System aims to provide a consistent product '[t]hat would encompass guest services, amenities, guest security, instruction standards, product standards, quality standards.' The evidence thus reveals that a genuine question exists regarding whether Holiday Inns retained the right to control Benton's provision of security at the motel.
 
 III.
 
 18
 The district court held that, as a matter of law, the sort of harm that befell Bond and Wilson at the motel was not forseeable by Southern. The railroad's potential liability, however, is predicated upon proof of Benton's negligence and proof that Benton was Southern's agent for FELA purposes. We have determined that a genuine question of fact exists concerning whether any negligence of Benton was a proximate cause of Bond's death and Wilson's injuries. Therefore, the material question is whether Benton was Southern's agent at the time of the incident.
 
 
 19
 The leading case on the question of a railroad's FELA liability for the acts of a third party is Sinkler v. Missouri Pacific Railroad Co., 356 U.S. 326 (1958), in which the Supreme Court held:
 
 
 20
 [W]hen a railroad employee's injury is caused in whole or in part by the fault of others in performing, under contract, operational activities of his employer, such others are "agents" of the employer within the meaning of Sec. 1 of FELA.
 
 
 21
 Sinkler, 356 U.S. at 331-32 (emphasis added).
 
 
 22
 The Court interpreted compensation for such injuries as falling within the purposes of FELA. 'The cost of human injury, an inescapable expense of railroading, must be borne by someone, and the FELA seeks to adjust that expense equitably between the worker and the carrier.' Id. at 329. Under Sinkler, an employee 'should be assured that all combining their exertions with him in the common pursuit will conduct themselves in all respects with sufficient care.' Id. at 330 (emphasis added). See also Ward v. Atlantic Coast Line Railroad Co., 362 U.S. 396, 397-98 (1960).
 
 
 23
 In Carney v. Pittsburgh & Lake Erie Railroad Co., 316 F.2d 277 (3d Cir. 1963), cert. denied, 375 U.S. 814 (1963), a railroad employee was injured while asleep and off-duty as a result of a fall from a negligently maintained bed in the YMCA at which he stayed at his employer's expense while working away from home. Carney, 316 F.2d at 278. The Third Circuit reviewed Sinkler, Ward, and Leek v. Baltimore & Ohio Railroad Co., 200 F. Supp. 368 (D.C. W. Va. 1962). In Leek, the railroad contracted with a taxi company to shuttle a railroad switching crew from their point of employment for the railroad company to the railroad yard. Through the fault of a cab driver, the plaintiff was injured during this trip. Leek, 200 F. Supp. at 370-71. The district court in Leek found that the taxi service was performing operational activities for the railroad at the time of the accident. In Carney, the Third Circuit followed Leek by determining that the railroad handled the employee's lodging through the YMCA to further the task of its enterprise. Carney, 316 F.2d at 281.
 
 
 24
 We are mindful that the 'FELA's liberal purpose must be kept in mind when confronting arguments that would restrict an employer's liability under the Act.' Baker v. Baltimore & Ohio Railroad Co., 502 F.2d 638, 641 (6th Cir. 1974). As a matter of law, Benton was Southern's agent. The railroad operated its business as a railroad in a manner that required Bond and Wilson to stay overnight, away from home, in Cleveland, Tennessee. Southern contracted for Benton to provide travel service and accomodations to its employees. In executing that contract, Benton performed operational activities of Southern. Therefore, negligence, if any, by Benton will be imputed to Southern RR and summary judgment in the railroad's favor was not proper.
 
 
 25
 For the foregoing reasons, although we express no opinion regarding the ultimate outcome of this case, the orders of summary judgment in favor of Benton, Holiday Inns, and Southern RR are VACATED and this matter is REMANDED for further proceedings.
 
 
 26
 WEICK, Senior Circuit Judge.
 
 
 27
 I concur in the result. The district court erred in granting summary judgments and its judgments should be reversed and the cases remanded to the district court for an evidentiary hearing and to adopt findings of fact and conclusions of law. The burden of proof to establish liability is upon the plaintiffs. The mere fact that Benton was a licensee of of Holiday Inns, Inc. does not establish liability on the part of Holiday Inns, Inc. Plaintiffs must prove agency and proximate cause. They must also prove negligence and proximate cause on the part of Benton. Tennessee law governs as to the liability of these defendants as jurisdiction was based on diversity of citizenship.
 
 
 28
 Jurisdiction of Southern Railway Company, however, was based on the Federal Employers Liability Act, 45 U.S.C. Secs. 1, et seq. Federal law governs and a railroad company is ordinarily held liable only for the negligence of one of its employees proximately causing injury to another person. To establish liability it must be determined first that the decedent and the injured co-employee were in the course and scope of their employment at the time the decedent met his death and his co-employee was injured and that the death and injury were proximately caused by the negligence of an agent of the railroad acting within the course and scope of his employment. 45 U.S.C. Secs. 1, et seq.